UNITED STATES BANKRUPTCY COURT                    **NOT FOR PUBLICATION**
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In Re:                                                            Case No. 806-70091-ast

JAMES M. LAVENDER and
DIANE L. LAVENDER f/d/b/a                                (Chapter 7)
LAVENDER AUTO
SALES,

                              Debtors.
--------------------------------------------------------X

MANHEIM'S PENNSYLVANIA
AUCTION SERVICES, INC. d/b/a
MANHEIM AUTO AUCTION and
MANHEIM AUTOMOTIVE FINANCIAL
SERVICES, INC.,

                              Plaintiff,                      Adv. Proc. No. 07-1172-ast

-against-

JAMES M. LAVENDER,

                              Defendant.

--------------------------------------------------------X
APPEARANCES:

Jeffrey Herzberg, Esq.                         Daniel C. Ross, Esq.
Zinker & Herzberg, LLP                        Keegan & Keegan, Ross & Rosner, LLP
278 East Main Street, Suite C                315 Westphalia Avenue
PO Box 866                                         PO Box 146
Smithtown, New York 11787                  Mattituck, New York 11952


HON. ALAN S. TRUST, United States Bankruptcy Judge:

### MEMORANDUM OPINION ON COMPLAINT TO DETERMINE
### NONDISCHARGEABILITY OF A DEBT

### Introduction

Before the Court is an adversary proceeding seeking the determination of

whether the debt owed by Debtor, James M. Lavender ("Debtor" or "Mr. Lavender"), to

creditor, Manheim's Pennsylvania Auction Services, Inc., d/b/a Manheim Auto Auction

and Manheim Automotive Financial Services, Inc. ("Manheim"), should be determined to

be nondischargeable, pursuant to 11 U.S.C. § 523(a)(2)(B).  For the reasons set out

herein, this Court has determined that the debt owed to Manheim should not be

discharged.

## Jurisdiction

This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§

157(b)(2)(I), and 1334(b), and the Standing Order of Reference in effect in the Eastern

District of New York.

## Procedural Background

On January 18, 2006, (the "Petition Date"), Mr. Lavender, along with his wife,

Diane L. Lavender ("Mrs. Lavender") (collectively the "Debtors"), filed a voluntary

petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy

Code"). [main case, dkt item 1]  Manheim commenced this adversary proceeding

against Debtors by complaint dated April 17, 2006.  A summons was issued on April 19,

2006.  Mrs. Lavender was initially named as formerly doing business as Lavender Auto

Sales ("Auto Sales").

On May 4, 2006, Debtors received their discharge from all dischargeable debts

that arose prior to the Petition Date, subject to the outcome of this adversary

proceeding.

By Order dated July 14, 2006, the Court dismissed all of the causes of action

against Mrs. Lavender and dismissed all of the causes of action against Mr. Lavender,

other than the cause of action against Mr. Lavender asserted under Section

523(a)(2)(B) of the Bankruptcy Code. [dkt item 11]

Trial was held before this Court on November 18, 2008.  The witnesses that

testified at the trial were: Mr. Michael Wynn, Manheim's Vice President of Global

Technology; Mr. Lavender; and Mr. Jeffrey H. Luber, an expert forensic document

examiner called by Mr. Lavender.

## Factual Background

The parties have either stipulated to the following facts in their Amended Joint

Pre Trial Memorandum [dkt item 75], or the testimony related thereto was not

controverted.

Manheim owned and operated one of the nation's largest car auction businesses,

including a large location in Manheim, Pennsylvania.  Debtors operated as Lavender

Auto Sales, a sole proprietorship located in Long Island and were engaged in the used

car business during all of the relevant time periods.  Mr. Lavender was the primary

person who dealt with Manheim.

Commencing on or about March 13, 1994, Mr. Lavender initiated a floor plan

financing arrangement with Manheim on behalf of Auto Sales (the "Floor Plan

Financing").  The Floor Plan Financing was a revolving line of credit that allowed Auto

Sales to purchase cars for its used car business.  Auto Sales purchased vehicles which

were sold at the Manheim auction facility in Pennsylvania, among other locations. Mr.

Lavender primarily took the following actions on behalf of Auto Sales: (a) purchasing

cars with Auto Sales funds and then seeking reimbursement for Auto Sales from

Manheim for the purchase price of each vehicle; and (b) transporting cars which Auto

Sales could not sell to the Manheim facility in Manheim, Pennsylvania, for resale at a Manheim auction. Manheim was granted a security interest against each and every vehicle purchased by Auto Sales using the Floor Plan Financing. As further security for each vehicle purchased through the Floor Plan Financing, Manheim was given the original title to each vehicle, a copy of the bill of sale, and a copy of the payment that Auto Sales made to the seller of the vehicle.

Mr. Lavender brought vehicles to Manheim for resale every week. Once the vehicle was transported onto Manheim's auction facility, Manheim controlled the entire auction sales process, including setting the payment terms and arranging for financing. Manheim would provide an accounting for each week's auction activities to each used car dealer selling cars at that auction, including Auto Sales, and would also distribute the sales proceeds for vehicles that had been purchased with Floor Plan Financing. Upon the sale of each vehicle, the proceeds were to be used to satisfy the Floor Plan Financing loan, auction charges and other charges. Any remaining net proceeds would then be disbursed to the used car dealers such as Auto Sales. Any deficiency owing on a car sold for less than the loan amount advanced by Manheim was expected to be quickly repaid by Auto Sales.

Manheim provided Auto Sales with an initial line of credit of $300,000.00. At the outset of the Floor Plan Financing, Auto Sales executed a promissory note dated March 21, 1994 (the "March 21, 1994 Note") in the original principal amount of Three Hundred Thousand and xx/100 Dollars ($300,000.00). [Tr. Ex. 6] The March 21, 1994 Note was executed by Auto Sales. [Tr. Ex. 6] Mr. Lavender claims that this was the only promissory note that he ever executed. Mr. Lavender executed a personal guaranty of

the March 21, 1994 Note. [Tr. Ex. C]

Commencing on or about October 15, 1994, Manheim increased the Auto Sales' Floor Plan Financing line of credit to Five Hundred Thousand and xx/100 Dollars ($500,000.00). [Tr. Ex. 8]  Mr. Lavender, on behalf of Auto Sales, executed a promissory note in the original principal amount of $500,000 dated September 2, 1994 (the "September 2, 1994 Note"). [Tr. Ex. 9]  The September 2, 1994 Note was guaranteed by Mr. Lavender.

The Floor Plan Financing arrangement ran for several years, with Auto Sales purchasing vehicles with its own funds, and then being reimbursed by Manheim.  Mr. Lavender arranged for the delivery of the cars that Auto Sales did not sell to Manheim's auction facility in Manheim, Pennsylvania.  Manheim sold these the cars at auction, and then disbursed the auction proceeds.

On or about October 31, 1997, Mr. Lavender, on behalf of Auto Sales, executed a promissory note in the sum of Nine Hundred Thousand and xx/100 Dollars ($900,000.00) (the "October 31, 1997 Note"). The October 31, 1997 Note was guaranteed by Mr. Lavender.  [Tr. Ex. D]  However, the October 31, 1997 Note never took effect because the Auto Sales credit line was not increased to $900,000.00 in or about October of 1997.

Four and one-half years into this business relationship Manheim did increase the Auto Sales line of credit from $500,000.00 to $900,000.00.  On or about September 18, 1998, Mr. Lavender on behalf of Auto Sales executed a promissory note in the sum of Nine Hundred Thousand and xx/100 Dollars ($900,000.00) (the "September 18, 1998 Note"). The September 18, 1998 Note was guaranteed by Mr. Lavender and was

allegedly executed by Auto Sales, a New York Corporation, although Auto Sales was actually a sole proprietorship. [Tr. Ex. F]

Approximately eight (8) months later, Manheim decreased the line of credit from $900,000.00 to $650,000.00. On or about May 11, 1999, Mr. Lavender, on behalf of Auto Sales, listed as a New York Corporation, although Auto Sales was actually a sole proprietorship, executed a promissory note in the sum of Six Hundred Fifty Thousand and xx/100 Dollars ($650,000.00) (the "May 11, 1999 Note"). The May 11, 1999 Note was guaranteed by Mr. Lavender. [Tr. Ex. G]

### Mr. Lavender's Financial Statements

Mr. Lavender provided Manheim with each of the following personal financial statements: (a) a March 16, 1994, statement executed in connection with the initial Floor Plan Financing (the "1994 Financial Statement") [Tr. Ex. 3]; (b) a November 20, 1996, statement (the "1996 Financial Statement") [Tr. Ex. 10] executed in connection with a 1996 review of the Floor Plan Financing [Tr. Ex. 11]; and (c) a September 2, 1998, statement (the "1998 Financial Statement") [Tr. Ex. 13] executed in connection with the increase of the Floor Plan Financing from $500,000.00 to $900,000.00 [Tr. Ex. 14, 15]. At trial, Mr. Lavender denied that he ever executed or caused the 1998 Financial Statement to be published. This Court, however, does not find that denial to be credible.

### Auto Sales Frequently Exceeded Its Borrowing Authority

Manheim maintained weekly accounting worksheets for Auto Sales reflecting the outstanding debt amount, the Floor Plan Financing limitation, and the amount of unused credit. [Tr. Ex. H] From time to time during 1998, Auto Sales exceeded its Floor Plan

Financing limits. These worksheets reflect the following borrowings:

| Date | Amount of Debt | Unused Credit/ (Over Credit Limit) |
|------|----------------|------------------------------------|
| January 9, 1998 | $240,204 | $259,796 |
| January 16, 1998 | $269,095 | $230,905 |
| January 16, 1998 | $250,854 | $249,146 |
| January 30, 1998 | $354,511 | $145,489 |
| February 6, 1998 | $317,784 | $182,216 |
| February 6, 1998 | $239,596 | $260,404 |
| February 13, 1998 | $281,982 | $218,018 |
| February 20,1998 | $272,939 | $227,061 |
| February 20, 1998 | $229,492 | $270,508 |
| February 27, 1998 | $344.545 | $155,455 |
| February 27, 1998 | $212,429 | $287,571 |
| April 3, 1998 | $514,906 | ($14,906) |
| April 3, 1998 | $140,924 | $359,076 |
| April 10, 1998 | $132,095 | $367,905 |
| May 1, 1998 | $378,499 | $121,501 |
| May 8, 1998 | $533,896 | ($33,896) |
| May 14, 1998 | $560,404 | ($60,504) |
| May 22, 1998 | $588,718 | ($88,718) |
| May 22, 1998 | $505,482 | ($5,482) |
| May 29, 1998 | $506,605 | ($6,605) |
| May 29, 1998 | $398,398 | $101,602 |
| June 5, 1998 | $501,392 | ($1,392) |
| June 19, 1998 | $348,177 | $151,823 |
| June 19, 1998 | $297,623 | $202,623 |
| June 26, 1998 | $334,543 | $165,457 |
| July 10, 1998 | $425,405 | $74,595 |

| | | |
|---|---|---|
| July 17, 1998 | $427,808 | $72,192 |
| July 24, 1998 | $415,798 | $84,202 |
| July 31, 1998 | $434,200 | $65,800 |
| August 7, 1998 | $582,282 | ($82,282) |
| August 7, 1998 | $505,024 | ($5,024) |
| August 14, 1998 | $397,494 | $102,506 |
| August 21, 1998 | $552,872 | ($52,872) |
| September 4, 1998 | $563,953 | ($63,953) |
| September 25, 1998 | $502,112 | ($2,112) |
| October 2, 1998 | $638,330 | ($138,330) |
| October 9, 1998 | $846,593 | ($346,593) |
| October 23, 1998 at 7:46 | $575,653 | ($75,653) |
| October 23, 1998 at 16:27 | $515,678 | ($15,678) |
| October 30, 1998 | $643,680 | ($143,680) |
| November 13, 1998 | $619,905 | $280,095 |

The November 13, 1998, report is the first internal Manheim worksheet that reflects the increase of the credit line from $500,000.00 to $900,000.00. These worksheets reflect that Auto Sales exceeded the credit limitations several times prior to the Floor Financing Plan being increased to $900,000.00. When the amounts Auto Sales borrowed exceeded the credit limit, Manheim could have: (a) reduced the net auction proceeds to be distributed to Auto Sales in order to repay the excess amount of debt outstanding; or (b) refused to advance additional funds for the purchase of vehicles until the credit line was reduced to the $500,000.00 limit. Manheim, however, did not do so.

**Manheim Did Not Conduct Perfect Due Diligence of or Followup on Auto Sales**

Manheim did not conduct perfect due diligence of, or followup on, the financial condition of Auto Sales. In addition to allowing the over advances discussed above, for example, Manheim claimed that it annually requested and received letters from a used car dealer's banking institution. However, the only banking institution letters in evidence regarding Auto Sales were form letters dated January 15, 1993; April 24, 1997; and May 5, 1999. Accordingly, only the January 15, 1993, and April 24, 1997, banking letters predated the increase of the Floor Plan Financing limitation from $500,000.00 to $900,000.00.  The April 24, 1997, letter predated the September 1998 Floor Plan Financing increase by approximately eighteen (18) months.

Further, the bank letters Manheim utilized requested only that the banking institution verify the following information:

a. whether the subject was a valued customer with a good reputation and financial responsibility, honest and reliable but short in capital, or a new customer with limited experience with the bank;

b. whether the account was a regular account or special account, and whether it was satisfactory or unsatisfactory;

c. whether the range of average balance on deposit was high, medium, or low, and whether it was 3 figures, 4 figures, 5 figures, or 6 figures;

d. whether the dealer issued insufficient checks;

e. whether the bank floor planned for this account; and

f. whether the bank accepted envelope drafts.

[Tr. Ex. K]  Manheim's form letter did not, however, request specific bank balances on deposit as of a certain date.

Moreover, Mr. Wynn further testified that, as a dealer, Auto Sales was required to

maintain insurance coverage for sixty-six percent (66%) of the approved line of credit.

Yet, Mr. Lavender testified that Auto Sales never modified the amount of its insurance

coverage of the vehicles after 1995, at which point the line of credit limit was

$500,000.00.

### The State Court Action

The Manheim-Auto Sales relationship came to an end in late 1999.  In 2000,

Manheim commenced litigation against Mr. Lavender, Mrs. Lavender, and Auto Sales in

the Supreme Court of the State of New York, County of Suffolk (the "State Court"),

Index No. 8672/2000 (the "State Court Action").  The State Court made extensive

findings of fact after a contested trial. [Tr. Ex. 2]  Among those findings were that,

between September 25, 1998 and November 23, 1999, Manheim issued checks in favor

of Auto Sales totaling $1,614,166.00.  After credits and adjustments were made, the

balance due to Manheim at the time of trial before the state court (excluding

prejudgment interest) was $339,403.37.  The state court granted Manheim a judgment

against Mr. Lavender, Mrs. Lavender, and Auto Sales in the total sum of $518,728.27

as of January 6, 2006. [Tr. Ex. 1]  The amount of this Judgment is composed of

$339,403.37 of principal owed as of March 28, 2000, plus prejudgment interest, costs,

and disbursements.  Manheim seeks to have this Court determine that this Judgment

survives Debtor's discharge.

### The Expert Witness and Mr. Lavender's Attack on the 1998 Financial Statement

Manheim was not able to produce the original 1998 Financial Statement signed

by Mr. Lavender.  Mr. Lavender hired an expert witness, Jeffrey H. Luber, to testify

regarding whether the copy of the 1998 Financial Statement utilized at trial was a

genuine reproduction of a document signed by Mr. Lavender, an authentic document, or a forgery by simulation.  This Court has no doubts about Mr. Luber's qualification to act as an expert in this case.

Based on his analysis of a copy of the purported 1998 Financial Statement that he examined, Mr. Luber concluded that he could not reach an opinion on whether the document was a genuine copy or a forgery by simulation.  In his report [Tr. Ex. H], Mr. Luber stated:

> The poor quality of the submitted Q1b [questioned document] precludes any conclusion concerning authorship by [Debtor].

Although Mr. Luber noted certain concerns, he never expressed an opinion that the 1998 Financial Statement was a forgery by simulation or otherwise, or was a "cut-and-paste" job.

## Analysis

To prevail before this Court, Manheim has the burden of proof on each of the elements of Section 523(a)(2)(B). *See Bayer Employees Fed. Credit Union v. Sapp* (*In re Sapp*), 364 B.R. 618, 625 (Bankr. N.D. W. Va. 2007)("[W]e hold that the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the evidence standard."(internal citations omitted)).  Section 523(a)(2)(B) of the Bankruptcy Code provides, in relevant part, as follows:

> A discharge under section 727 . . .  of this title does not discharge an individual debtor from any debt –
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
> >
> > > (B) use of a statement in writing –

(I) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).

**1.    *Section 523(a)(2)(B): Mr. Lavender's Use of a Statement in Writing***

As previously noted, this Court does not find as credible Mr. Lavender's maintaining that he did not sign the 1998 Financial Statement and did not cause the 1998 Financial Statement to be made or published . At trial in this proceeding, Mr. Lavender contradicted his sworn deposition testimony from the State Court Action, in which he admitted his signature was on the 1998 Financial Statement, and that he provided the information contained on the 1998 Financial Statement.[1] This Court also does not find as credible Mr. Lavender's speculations that a former employee of Manheim wrongfully filled in the information on the 1998 Financial Statement without Mr. Lavender's knowledge.

As for Mr. Luber, he did not express an opinion that the 1998 Financial Statement was a forgery by simulation or otherwise, or a "cut-and-paste job." . This Court does not conclude that the 1998 Financial Statement was either a forgery, a forgery by simulation, or a "cut-and-paste job." Manheim has overcome any concerns

---

[1] Portions of the transcript from the State Court Action were read into the record at the trial in this proceeding, to impeach Mr. Lavender's testimony before this Court.

that may have arisen over the absence of the original 1998 Financial Statement.[2]

Thus, Manheim has met its burden of proof under Section 523(a)(2)(B) that a writing was signed or published by Mr. Lavender.

**2.      *Section 523(a)(2)(B)(I): The 1998 Financial Statement Is Materially False***

Because the 1998 Financial Statement is materially false, Manheim has met its burden of proof under Section 523(a)(2)(B)(I).  Specifically, the materially false aspects of the 1998 Financial Statement are as follows:

- Mr. Lavender and Mrs. Lavender did not own three (3) of the real properties he  listed on the 1998 Financial Statement.

- They did not own the property in Heather Ridge, Florida, which was listed as being worth $150,000.00.

- They did not own the property on Maureen Drive in Mt. Sinai, New York, which Mr. Lavender listed as being worth $450,000.00.

- They did not own the Route 25A property in Mt. Sinai, New York, which Mr. Lavender listed as being worth $490,000.00.

These three properties were listed as being owned free and clear, representing an equity value to Mr. Lavender of $1,090,000.00.  Further, although Mr. Lavender did own the Miller Court property, he owed more than the $200,000.00 mortgage debt he listed.  Thus, the 1998 Financial Statement was materially false as Mr. Lavender overstated his

---

[2]  At trial neither Mr. Wynn, Mr. Lavender, nor Mr. Luber commented on the facsimile transmission header at the very top of both pages of Tr. Ex. 21:  "Sep 09 98 11:15a LAVENDER AUTO SALES (516) 928-7702".   An inference could be drawn that the facsimile transmission header on Plaintiff's Trial Exhibit 21 establishes that the 1998 Financial Statement was faxed to Manheim by Mr. Lavender.  However, because no witness testified as to the meaning or significance of this fax header, this Court does not draw this inference.

net worth by over $1,000,000.00, an overstatement of greater than fifty percent (50%).

Finally, this Court notes that the 1998 Financial Statement falsely lists a life insurance policy with a cash surrender value of $100,000.00 that Mr. Lavender did not own, and lists $50,000.00 of stocks and bonds Mr. Lavender did not own.

3.    ***Section 523(a)(2)(B)(ii): The 1998 Personal Financial Statement Is Respecting the Debtor's or an Insider's Financial Condition***

Mr. Lavender signed the 1998 Financial Statement, regarding his financial condition.  Therefore, Section 523(a)(2)(B)(ii) is satisfied.

4.    ***Section 523(a)(2)(B)(iii): Manheim Actually and Reasonably Relied on the 1998 Financial Statement for an Extension, Renewal, or Refinancing of Credit***

Manheim, as a creditor to whom the debtor is liable, both actually and reasonably relied on the 1998 Financial Statement for an extension, renewal, or refinancing of credit.  When Mr. Lavender, on behalf of Auto Sales, initiated the Floor Plan Financing in 1994, it signed a promissory note for $300,000.00 in March 1994. [Tr. Ex. 6]  Auto Sales signed a promissory note for $500,000.00 in September 1994. [Tr. Ex. 9]  Both the March 21, 1994 and the September 2, 1994 Note were essentially demand notes. These Notes provide, *inter alia*, that any advance for a vehicle is due forty-eight (48) hours after the time a vehicle is sold or twenty-four (24) hours from the time the borrower is paid for a vehicle it sold, or any date after sixty (60) day after Manheim makes an advance for a vehicle Auto Sales purchased. [Tr. Ex. 9] As noted above, after August 21, 1998, until the increase in the credit line took effect, Auto Sales consistently owed Manheim in excess of $500,000.00.  Manheim could have demanded payment of some or all of these advances, but, based one the relationship it had with Mr. Lavender

and Auto Sales, it did not.

The payment terms of the September 18, 1998,  $900,000.00 Note were essentially the same as the 1994 notes. [Tr. Ex. H] Thus, the September 18, 1998, $900,000.00 Note reflects an extension, renewal or refinancing of credit.

According to Mr. Wynn, the Floor Plan Financing was increased from $500,000.00 to $900,000.00 in September of 1998 based on the following three (3) factors:

a. a current credit report by one of the three (3) credit bureau reporting agencies;

b. the performance of the dealer at the auction level; and

c. the financial strength of the dealer – that is, the liquidity of the dealer and his ability to inject cash into the dealership.

According to the Manheim Floor Plan Credit Limit Increase Request dated September 2, 1998, an internal document that was signed by Mr. Lavender, the purpose of the temporary increase in the floor plan financing limitation to $900,000.00 was: "To purchase more cars at Enterprise Blow Out Sale." The comments of the Manheim representative stated:

Dealer wholesales 'Enterprise R.A.C.' units from Long Island & Central NY. Strong seller at MAA worthy of temporary increase owns a lot of property on Long Island. His insur. is okay up to 750K increase, I am comfortable with that.

[Tr. Ex. 14].  Thus, not only was this increase intended to be temporary, it was clearly based, at least in part, on Mr. Lavender's financial condition as he represented it to be.

Mr. Lavender makes much of the fact that Manheim never verified any of the figures stated in the 1998 Financial Statement, or, for that matter, in any of the earlier financial statements.  It appears that no one at Manheim investigated whether Mr.

Lavender actually owned any of these properties, whether there was, in fact, mortgage debt against the Miller Court property exceeding the $200,000.00 listed by Mr. Lavender, or whether there was equity in any of these real properties.  However, Manheim did rely on Mr. Lavender providing truthful and accurate statements of his assets and liabilities.  Mr. Lavender either filled in the specific numbers on the 1998 Financial Statement or provided the amounts to be filled in.  In either event, Mr. Lavender signed and published the financial statement and thereby represented the truth and accuracy of the information contained therein, and Manheim relied thereon.

Mr. Lavender correctly states that Manheim never undertook a comparative analysis of the figures stated in the 1998 Financial Statement against the figures set forth in his March 16, 1994, personal financial statement and/or his November 20, 1996, personal financial statement.   Again, Manheim relied on Mr. Lavender providing truthful and accurate statements of his assets and liabilities.  At no time prior to increasing the Floor Plan Financing limit to $900,000.00 did Manheim have a basis to believe that Mr. Lavender had provided false financial information.

This Court does note that, had Manheim compared the figures set forth in the November 1996 Financial Statement against the 1998 Financial Statement, it should have noticed the following changes:

a. the cash position increased from 0 to $300,000.00;

b. the cash surrender value of the life insurance policy increased from $20,000.00 to $100,000.00;

c. the stocks and bonds value increased from 0 to $50,000.00;

d. the value of the real properties increased from $650,000.00 to $1,600,000.00;

and

e. the mortgage indebtedness decreased from $335,000.00 to $200,000.00.

Ostensibly, Mr. Lavender represented he had experienced a change in positive net worth from $936,000.00 in November 1996 to $1,850,000.00 in September 1998.  Yet, neither this amount of aggregate change nor the individual changes are suspicious or suspect in and of themselves, particularly in relation to the remaining financial information Manheim had received on Lavender and Auto Sales, and the level of business Auto Sale was conducting.  Further, while Manheim never performed accounting or financial analyses concerning whether Mr. Lavender had the ability to repay the balance of the outstanding Floor Plan Financing, this lack of an analysis was reasonable under the totality of the circumstances.

By September 1998, Manheim had four and a half years of experience doing business with Mr. Lavender and Auto Sales, and had an adequate, reasonable basis to approve the increase in the Floor Plan Financing.  Moreover, Manheim's internal line increase memo set four criteria established by Manheim for approval of the increase:  a personal guaranty of Mrs. Lavender; evidence of insurance on the cars of $600,000.00; a bank letter; and proof of a dealer license. [Tr. Ex. 15] Mr. Wynn testified that Manheim satisfied itself that these criteria were met by Auto Sales and Mr. Lavender. [Tr. Ex. 23, 24]  In addition, Manheim had the Lavenders' 1996 and 1997 tax returns. [Tr. Ex. 22] The 1996 tax return reflected adjusted gross income for the Lavenders in excess of $400,000.00, and the 1997 tax return reflected adjusted gross income for the Lavenders in excess of $450,000.00.  Manheim also had the Lavenders' credit scores.  This Court cannot determine, however, whether the required $600,000 of insurance on the cars

was ever verified by Manheim.

Mr. Wynn testified that Manheim relied on the 1998 Financial Statement when it made the decision to temporarily approve the credit line increase to Auto Sales from $500,000.00 to $900,000.00 in late 1998, and to renew and extend the existing credit line of $500,000.00.  Mr. Wynn also testified, and Trial Exhibit 17 demonstrates, that when the temporary increase expired in early 1999, the Auto Sales credit line did not revert to $500,000.00 but was set at $650,000.00.  This decision to reduce the line to $650,000.00 was made using much of the same information upon which the September 1998 increase, extension and renewal decision was based.  This is perfectly reasonable, given that the primary stated purpose of the 1998 increase was to "purchase more cars at Enterprise Blow Out Sale," and this large increase was to be temporary.

Reasonableness of a creditor's reliance is objectively determined by considering what a reasonably cautious person in the same business transaction would do. *In re Larrieu*, 230 B.R. 256 (Bankr. E.D. Pa. 1999).  Further, the creditor need not have relied entirely on the false information -- partial reliance will suffice. *In re Barron*, 126 B.R. 255 (Bankr. E.D. Tex.1991).

In *Barron*, the debtor defending the Section 523(a)(2) action asserted, *inter alia*, that the lender did not rely on the false financial statements. The court stated:

> The financial statements were annual statements delivered to the bank on a more or less annual basis and placed in the files for the ostensible purpose of maintaining a current financial picture of the bank's customer. The bank was not able to demonstrate a direct connection between the submission of the financial statement and the incurring of the debt.

*Id.* at 259.

However, the *Barron* court further stated:

> The bank officer testified that he relied on the financial statement along with his perception of the Debtor's ability to earn money, the long past history of a successful banking relationship and the Debtor's reputation and standing in the community. There is no requirement in the law that the false financial statement be the only thing on which the creditor relied. It is clear that partial reliance on a materially false financial statement is sufficient to deny the debtor a discharge from that particular debt.

*Id.* (internal citations omitted).

Here, Manheim actually relied on the 1998 Financial Statement and its long history of dealing with Mr. Lavender, as well as, *inter alia*, the 1996 and 1997 tax returns of the Debtors. The written comments supporting the line increase specifically noted Mr. Lavender "owns a lot of property on Long Island."

Manheim's reliance was also reasonable. The court in *Larrieu* recited various factors to consider in determining if the creditor acted reasonably. The first factor was whether the debtor and creditor had a business relationship. A second factor was whether the parties had previous dealings so as to have developed a relationship of trust. A third factor was the length of the time of the relationship. *Larrieu*, 230 B.R. at 265. In this case, Mr. Lavender's relationship with Mahneim had been in effect for more than four and a half years before the September 1998 increase, during which time the parties had weekly or at least monthly contact. Mr. Lavender's relationship with the Manheim auction facility in Pennsylvania began even earlier than March 1994.

Another factor identified in *Larrieu* was whether a credit check had been conducted. *Id.* Here, not only had Mahneim conducted a credit check, but bank letters were obtained, inventory aging had been considered, and tax returns had been requested and received. Moreover, Mr. Lavender was a longtime customer of

Mahneim. The financial statement upon which Manheim relied did not contain information indicating that a further investigation was required. In similar circumstances in *In re Garman*, 643 F.2d 1252 (7th Cir. 1980), the court determined that, absent facts indicating verification was necessary, the creditor's reliance on the debtor's representations was reasonable and the debtor's debt would not be discharged. *Northern Trust Co. v. Garman* (*In re Garman*), 643 F.2d at 1259-60.

Mr. Lavender  asserts that Manheim did not act reasonably in failing to obtain verification of the title to the real properties listed on the 1998 Financial Statement. Manheim argues, and this Court agrees, that, had the real property served as security for the Floor Plan Financing line of credit, then the failure to obtain a title search would be indicative of a lack of reasonableness.  However, while the real property was an important component of Mr. Lavender's net worth, it was not pledged as collateral security for either the Auto Sales debt or Mr. Lavender's guaranty thereof.  Reliance is not unreasonable simply because the creditor fails to verify information, especially when the business relationship has been in existence for an extended period. *In re Mullet*, 817 F.2d 677, 681(10th Cir.1987).

In *In re Norris*, 70 F.3d 27 (5th  Cir. 1995), the debtor signed a note to the creditor in 1986, collateralized by real property.  The note had annually and routinely been renewed by the bank until 1991.  In connection with the 1992 renewal, the debtor submitted a balance sheet, income statement, and tax return, which all showed a cash flow surplus of $45,016.00.  However, the "income surplus" turned out to be false. The debtor later argued that the bank had not relied on the financial statement but on the value of the real property that collateralized the loan, and further argued that, prior to

1991, the bank had not even required financial statements for the annual renewal.  Mr.

Lavender's similar argument here is that Mahneim did not rely on the value of the real

property because the funds advanced to Lavender Auto Sales were secured by the

vehicles.

The *Norris* court, however, credited the bank officer's testimony that the bank

relied upon the financial statement because the value of the collateral was decreasing.

The Fifth Circuit Court of Appeals affirmed the lower court's findings, agreeing that the

bank's reliance on the financial statement was objectively reasonable, and that, even

though the bank was aware that the value of the real property was overestimated, there

was no "red flag" in the financial statement, which would create a duty on the part of the

bank to investigate.

Here, Manheim actually and reasonably relied on Mr. Lavender's financial

wherewithal as part of the source of repayment for the $900,000.00 September 18,

1998 Note.  Consequently, Manheim has met its burden in satisfaction of Section

523(a)(2)(B)(iii).

**5.**    ***Section 523(a)(2)(B)(iv): Mr. Lavender Caused the 1998 Financial Statement
         to Be Made or Published with Intent to Deceive***

Mr. Lavender did not attempt to explain any of the falsities on his 1998 Financial

Statement as the product of mistake, inadvertence, or neglect.  In fact, he did not

attempt to explain the false entries at all.  Rather, he staked his defense on two

arguments: (1) he relied on a denial of having executed the 1998 Financial Statement, a

denial this Court has found not to be credible; and (2) he argued that Manheim should

have caught his misrepresentations sooner, a posture this Court rejects.

To establish that a debtor had an intent to deceive does not require a debtor to have a malicious heart. *In re Webb*, 256 B.R. 292, 297 (Bankr. E.D. Ark. 2000)(citing *In re Barron*, 126 B.R. 255 (Bankr. E.D. Tex. 1991)).  Instead, intent to deceive focuses on objective facts and circumstances. *Id.*  Further, as Judge Milton of this Court wrote in *In re Demar,* "A court should examine the totality of the circumstances to make an inference as to whether the debtor submitted a financial statement with an intent to deceive." *Shaefer v. Demar* (*In re Demar*), 373 B.R. 232, 238 (Bankr. E.D.N.Y. 2007)(*citing In re Hambley*, 329 B.R. 382, 400 (Bankr. E.D.N.Y. 2005) *and In re Senty*, 42 B.R. 456, 460 (Bankr. S.D.N.Y. 1984)).

Here, this case is again similar to *Barron*, in which the court stated:

> A determination of intent under this section is much like a determination of reasonable reliance; an objective standard to be determined by the fact finder. Intent to deceive may either be demonstrated by proof that the debtor acted intentionally or knowingly or in the alternative that debtor's conduct exhibited reckless indifference to the existing facts. Necessarily, debtor's intent cannot be divined in a vacuum but must be viewed in light of the circumstances of the case. Therefore, a debtor's credibility is an important factor in determining whether the debtor's intent to deceive was present ... In the instant case, this Court, viewing Debtor's conduct in light of the totality of circumstances surrounding the submission of the materially false financial statements can come to no other conclusion than that Debtor published the materially false financial statements with intent to deceive. Proof of intent to deceive does not require the demonstration that Debtor acted with a malignant heart but only that Debtor's actions demonstrate reckless indifference to the actual facts.

*In re Barron*, 126 B.R. at 260 (internal citations omitted).

Mr. Lavender's testimony was not credible, especially given his refusal at this trial to admit he signed and submitted the 1998 Financial Statement.  Not only is that denial against the great weight of the trial evidence, but it flatly contradicted his admission in a deposition he gave in the State Court Action.  That deposition testimony was used to

impeach Mr. Lavender's denial of execution of the 1998 Financial Statement.

Although Mr. Luber testified in a professional and forthright fashion, he did not render an opinion that shed any meaningful doubt on Mr. Lavender having executed and published the 1998 Financial Statement.

Further, Mr. Lavender had previously handwritten his purported ownership of the property in Heather Ridge, Florida, which he listed as being worth $150,000.00 on his original 1994 financial statement [Tr. Ex. 3], as well as on his 1996 Financial Statement. [Tr. Ex. 10]  Mr. Lavender had also previously handwritten his purported ownership of the property on Route 25A property in Mt. Sinai, New York, on his 1996 Financial Statement. [Tr. Ex. 10]   It is, however, unclear from the evidence whether Mr. Lavender never owned these properties, or whether he owned them during any portion of the time he reflected this ownership on his various financial statements.[3]  Therefore, either he had perpetuated his false claim of ownership of certain of these properties for several years, or he failed to correct his claim of ownership after losing ownership.  Either way, he objectively manifested an intention to deceive.

Based on the totality of circumstances, Mr. Lavender caused the1998 Financial Statement to be made or published with intent to deceive, in satisfaction of Section 523(a)(2)(B)(iv).

### **Conclusion**

This Court has determined that Mr. Lavender did obtain money, property, or an

---

[3]  The parties stipulated that Mr. Lavender did not own these three real properties as of September 2, 1998. [Joint Pretrial Memorandum p. 5] No evidence in the record shows either that he ever owned them, or, if he did once own them, when he lost ownership.

extension, renewal, or refinancing of credit, by use of a statement in writing that is materially false, respecting the debtor's or an insider's financial condition, on which the creditor to whom the debtor is liable for such money, property, or credit reasonably and actually relied, which statement the debtor caused to be made or published with intent to deceive.  The amount of that debt owed to Manheim is the amount as liquidated and determined by the state court in the State Court Action. As such, the debts owed by Mr. Lavender to Manheim should not be discharged, and the Judgment of the state court survives Mr. Lavender's discharge.

Manheim is directed to submit a proposed Judgment consistent with this Memorandum Opinion within fourteen (14) days of the entry hereof.


Dated: February 9, 2009
     Central Islip, New York                    */s/ Alan S. Trust*
                                            Alan S. Trust
                                            United States Bankruptcy Judge